# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| JEFFERY BLUBAUGH, individually and on behalf of a class of all persons and entities similarly situated, | Case No. 4:25-cv-00527-FJG |
| | Hon. Fernando J. Gaitan, Jr. |
| Plaintiff, | |
| v. | |
| EVERYTHING HEALTH INVESTMENTS, LLC, | |
| Defendant. | |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT'S
COMBINED MOTION FOR SUMMARY JUDGMENT AND,
<u>IN THE ALTERNATIVE, MOTION TO STRIKE CLASS ALLEGATIONS</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................................. 3

III. SUMMARY JUDGMENT STANDARD ............................................................................. 5

IV. ARGUMENT ...................................................................................................................... 7

    A. THE CONSENT EVIDENCE IS LEGALLY INSUFFICIENT AS A MATTER OF LAW .7

        1. The Consent Forms Do Not Identify Everything Health as "the Seller" .......................... 7

        2. No Signed, Written Agreement Exists Between Plaintiff and Defendant ....................... 11

        3. The Purported Electronic Consent Does Not Comply with the E-SIGN Act .................. 12

    B. THE CONSENT EVIDENCE IS INADMISSIBLE AND CANNOT SUPPORT
SUMMARY JUDGMENT ...................................................................................................... 13

        1. Mr. Bernstein Cannot Authenticate Third-Party Records ................................................. 13

        2. The Consent Records Are Inadmissible Hearsay .............................................................. 15

    C. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT .17

        1. Plaintiff's Sworn Denial Creates a Triable Issue .............................................................. 17

        2. Plaintiff's Circumstances Make the Alleged Conduct Implausible ................................. 18

        3. Defendant's Own Evidence Shows Automated Activity .................................................... 19

        4. Internal Inconsistencies Undermine Defendant's Records ............................................... 21

        5. Missing Evidence for September 2024 Event ................................................................... 22

V. THE MOTION TO STRIKE CLASS ALLEGATIONS SHOULD BE DENIED .................. 22

VI. CONCLUSION .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 6, 18

*Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. 2014) ...................................... 10

*Blow v. Bijora, Inc.*, 855 F.3d 793 (7th Cir. 2017) .................................................. 6, 17

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119 (6th Cir. 2016) ………………… 25

*Clotz v. Federal Savings Bank*, No. 22 CV 3755, 2024 U.S. Dist. LEXIS 249080
(N.D. Ill. Feb. 21, 2024) ……………………………………................................. 6–7, 18, 22

*Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080 (8th Cir. 2021) .............................. 24, 27

*Elkins v. Medco Health Solutions, Inc.*, 2014 U.S. Dist. LEXIS 57633 (E.D.Mo. Apr. 25,014)..10

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) ...................................... 6

*Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852 (N.D. Ill. 2024) ............................ 2, 13–14, 17

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593 (7th Cir. 2015) ............................ 6

*Insurance Marketing Coalition Ltd. v. FCC*, 127 F.4th 303 (11th Cir. 2025) ………………... 8–9

*Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72 (3d Cir. 2011) ……………….. 24

*Mantha v. Quotewizard.com, LLC*, 2021 WL 6061919 (D. Mass. Dec. 3, 2021) ………….. 10, 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ………………….... 6

*Medina v. Enhanced Recovery Co.*, 2017 U.S. Dist. LEXIS 186651 (S.D. Fla. Nov. 9, 2017) ... 24

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012) .................................................. 8

*Mohamed v. Off Lease Only, Inc.*, 320 F.R.D. 301 (S.D. Fla. 2017) ........................................... 25

*Oliver v. TTC-Ameridial, LLC*, 2018 U.S. Dist. LEXIS 39748 (N.D. Ill. Mar. 12, 2018) .......... 10

*Panacci v. A1 Solar Power, Inc.*, 2015 WL 3750112 (N.D. Cal. June 15, 2015) ……………..... 25

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........................................... 6

*Reyes v. BCA Fin. Servs.*, 2018 U.S. Dist. LEXIS 106449 (S.D. Fla. June 26, 2018) ................ 25

*Robertson v. Mortgage Research Center, LLC*, 2024 U.S. Dist. LEXIS 221676
(W.D. Mo. Dec. 9, 2024) ................................................................................. 26

*Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308 (D. Mass. 2020) .............................. 24

*Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992 (8th Cir. 2016) .............. 24

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) ............................................... 12

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) ................................................. 6, 18

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) …………………….. 6, 17

**Statutes and Regulations**

15 U.S.C. § 7001 ...................................................................................... 12–13

47 C.F.R. § 64.1200 ................................................................................. 2, 7–9

47 C.F.R. § 64.1200(c)(2)(ii) .................................................................... 8–9

47 C.F.R. § 64.1200(f)(9) ......................................................................... 2, 7–8

Fed. R. Civ. P. 56 ..................................................................................... 5

Fed. R. Evid. 801 ...................................................................................... 15

Fed. R. Evid. 802 ...................................................................................... 15

Fed. R. Evid. 805 ...................................................................................... 15

Fed. R. Evid. 901 ...................................................................................... 13–14

**Other Authorities**

In re Rules & Regulations Implementing the TCPA of 1991,
27 FCC Rcd 1830 (2012) ........................................................................ 8, 12

90 Fed. Reg. 42,137 (Aug. 29, 2025) ...................................................... 9

## I.  INTRODUCTION

Defendant Everything Health Investments, LLC ("Everything Health") moves for summary judgment on the ground that Plaintiff Jeffery Blubaugh allegedly consented to its telemarketing calls on four separate occasions. That defense fails as a matter of law—and on the facts—for three independent reasons, any one of which alone requires denial of the motion.

First, none of the four consent forms that Everything Health produced identifies "Everything Health Investments, LLC" as an authorized caller. The forms appeared on websites that Everything Health neither owns nor operates—a job listings site (onlygreatjobs.com), an income opportunities site (higherincomejobs.com), a nonprofit relief organization's website (relief.spaoa.org), and a Medicare advertisement—and each form names entirely different entities as the authorized callers: Medigap Life, Allied Insurance, Innovative Financial Group, and the Single Parents Alliance of America, among others. The FCC's regulations require consent to "the seller"—the specific entity making the calls, by name. 47 C.F.R. § 64.1200(f)(9). Everything Health is not named in a single one of these forms. That failure is dispositive as a matter of law.

Second, Everything Health's entire evidentiary submission rests on a single declaration from its own managing partner, Eric Bernstein, who has no personal knowledge of how Verisk Marketing Solutions' data systems work, how the ActiveProspect TrustedForm certificate was generated, or how any of the four third-party websites operated. The Verisk TCPA Guardian reports were not even prepared for Everything Health—they were prepared for Aragon Advertising LLC. A party's interested declaration cannot authenticate records created by strangers to the litigation, and the records themselves constitute multiple layers of inadmissible hearsay. *See Hossfeld v. Allstate Ins. Co.,* 726 F. Supp. 3d 852, 873–74 (N.D. Ill. 2024) (rejecting analogous consent evidence on authentication and hearsay grounds in a TCPA case). Making matters worse

1

for Defendant, its own video exhibits (Exhibits B, C, and D) show form fields that are at times pre-populated with Plaintiff's information without any visible human typing, mechanical mouse movements inconsistent with human interaction, rapid unnatural keystrokes, and sessions that begin mid-interaction with no record of how the forms were first accessed. Defendant's own evidence thus corroborates, rather than refutes, the possibility that an automated system submitted his information without his knowledge.

Third, even if the evidence were legally sufficient and admissible—it is neither—Plaintiff Jeffery Blubaugh has submitted a sworn declaration categorically denying that he ever visited any of the websites, ever submitted information through any insurance-related form, or ever consented to receive marketing calls from any insurance company. His denial is anchored in compelling circumstance: he already receives comprehensive health coverage through Medicare and Medicaid at no cost to him and has no reason whatsoever to seek insurance quotes on a job listings site, an income website, or a nonprofit organization's relief page. This sworn denial creates a genuine dispute of material fact that only a jury can resolve.

For all of these reasons, Everything Health has not come close to meeting its burden of establishing the affirmative defense of consent without genuine dispute, and its motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

On July 10, 2025, Plaintiff Jeffery Blubaugh filed this class action alleging that Everything Health placed unlawful telemarketing calls to his personal residential telephone number, which has been listed on the National Do Not Call Registry since July 2, 2024. Complaint ¶¶ 20–22. Plaintiff received at least six calls between July 15, 2024 and March 12, 2025, including a pre-recorded message call on August 14, 2024 from an agent who identified himself as "Matthew

Strang," whose employment by Everything Health was confirmed by his email address (mstrang@everythingmedicare.com). *Id.* ¶¶ 24–34.

On January 20, 2025, Plaintiff received another call and expressly told the caller he was not interested, indicating that did not want to be contacted further. Complaint ¶ 33. Despite this oral revocation, Everything Health called Plaintiff twice more on February 4, 2025, and again on March 12, 2025. *Id.* ¶ 34.

Everything Health's consent defense rests on four alleged web-form events, none of which names Everything Health as an authorized caller. The first purported consent—allegedly October 10, 2023, on onlygreatjobs.com, a job listings website—carries TCPA disclosure language authorizing calls from "Medigap Life" and unspecified "Marketing Partners." Defendant's Statement of Uncontroverted Material Facts ("DSUMF") ¶¶ 8–11. The second—allegedly March 24, 2024, on higherincomejobs.com, an income opportunities website—names "Allied Insurance, Vincent Cortazar/Medigap Life, 100INSURE, Go Health, LLC, HealthPlanOne, LLC, ClearMatch Medicare, Medicare Solutions," among other names. DSUMF ¶¶ 13–17. Everything Health is not among them. The third—allegedly September 10, 2024, through a Medicare-related advertisement—names only "Innovative Financial Group." DSUMF ¶¶ 19–21. The fourth— allegedly February 11, 2025, on relief.spaoa.org, the website of the Single Parents Alliance of America (SPAOA), a nonprofit—names "Single Parents Alliance of America (SPAOA), Holiday Relief (HR), American Hope Resources (AHR), Americas Health, Benefitlink and our Marketing Partners." DSUMF ¶¶ 23–27. Everything Health Investments, LLC does not appear in any of these four consent disclosures.

The Verisk Marketing Solutions TCPA Guardian reports filed as Exhibit A are stamped "Prepared for Aragon Advertising LLC"—not for Everything Health. See Ex. A (EHI 00002,

00007). The Bernstein Declaration contains no attestation that Mr. Bernstein has any personal knowledge of how Verisk's systems capture, encrypt, hash, or report lead data; how ActiveProspect generates TrustedForm certificates or event logs; or how any of the four third-party websites operated. He simply states that he "reviewed" the records and that they purportedly show Mr. Blubaugh consented. Bernstein Decl. ¶¶ 4–6.

The TrustedForm event log for the February 11, 2025 entry on relief.spaoa.org (EHI 00012–00015) records over 100 events, most of which are sequential Backspace keystrokes entered into the phone-number field. Ex. A (EHI 00012–00013). This pattern is wholly inconsistent with a human user typing a 10-digit telephone number and is consistent with automated bot activity. The session began at 4:21 AM CST. Ex. A (EHI 00010). The log also shows that a different telephone number—"(816) 466-4350"—was briefly entered and then overwritten, a hallmark of automated pre-fill logic misfiring. Ex. A (EHI 00014). The Request for PTC document for the September 2024 event (EHI 00017) lists an IPv6 address of '2600:100a:b032:8984:0:1e:d7e5:d301'—inconsistent with the IPv4 addresses recorded in the Verisk reports for the other alleged consent events—creating internal discrepancies across Defendant's own lead records.

Everything Health also filed three screen recordings of Verisk Visual Playback sessions as Exhibits B, C, and D, purportedly depicting the October 2023, March 2024, and February 2025 consent events respectively. A review of those video exhibits reveals conduct that fatally undermines Defendant's consent theory rather than supporting it. In all three videos, the form fields containing Plaintiff's personal information—including his name, phone number, and email address—appear pre-populated without any visible human typing. No one is shown manually entering Plaintiff's data. The mouse movements visible in the recordings are mechanical and

inconsistent with ordinary human browsing behavior. The videos also display rapid, unnatural keystroke patterns. And critically, all three recordings appear to begin mid-session, with no footage showing how the user arrived at the form, how the form was first accessed, or what occurred at the start of the interaction. In other words, the videos Defendant filed to prove consent instead show precisely what Plaintiff contends: automated pre-population of his personal data by a system that required no human involvement. Notably, no video exhibit was filed for the September 10, 2024 consent event—the third of the four alleged consents. Defendant has produced no visual playback for that event whatsoever.

Plaintiff Jeffery Blubaugh has submitted a sworn declaration under penalty of perjury stating that he never visited onlygreatjobs.com, higherincomejobs.com, or any insurance-related quote website; never submitted his information through any online form for health insurance, Medicare, or similar products; and never initiated any request for any insurance entity to contact him. Declaration of Jeffery Blubaugh ("Blubaugh Decl.") ¶¶ 6–9, 14. He further states that he already receives comprehensive health insurance through Medicare and Medicaid at no cost to him, leaving him no reason to seek health insurance quotes on a job listings site, an income site, or a nonprofit's website. *Id.* ¶¶ 4–5, 10. Mr. Blubaugh has not been employed full-time in approximately ten to twelve years and has earned approximately $2,000 over the past two years. *Id.* ¶¶ 2–3.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

5

Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Because credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, a court may not resolve those questions at summary judgment. *Id.*

The standard is especially demanding here because consent is an affirmative defense on which the defendant bears the burden of proof. *Blow v. Bijora, Inc.,* 855 F.3d 793, 803 (7th Cir. 2017) (citing *Van Patten v. Vertical Fitness Grp., LLC,* 847 F.3d 1037, 1044 (9th Cir. 2017)); *Gager v. Dell Fin. Servs., LLC,* 727 F.3d 265, 271 (3d Cir. 2013) (recognizing that the TCPA is a remedial statute that should be construed to benefit consumers). When a defendant moves for summary judgment on its own affirmative defense, it "must lay out the elements of the [defense], cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant…." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund,* 778 F.3d 593, 601 (7th Cir. 2015). Summary judgment is appropriate only where the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

This exact standard was applied in *Clotz v. Federal Savings Bank*, No. 22 CV 3755, 2024 U.S. Dist. LEXIS 249080, at *5–6 (N.D. Ill. Feb. 21, 2024), where the court denied summary judgment on consent in a TCPA case presenting allegedly Jornaya-verified lead records. The plaintiff denied ever visiting a third-party lead-generation website despite lead data linking his own IP address and email to the site, and his browsing history did not show the website. The court held that this created "conflicting evidence as to whether [plaintiff] actually visited [the website]

6

on the date in question" that "precludes granting summary judg[ment]." *Id*. at \*5–6. Everything

Health has not come close to clearing this bar.

## IV. ARGUMENT

## A. THE CONSENT EVIDENCE IS LEGALLY INSUFFICIENT AS A MATTER OF LAW.

The TCPA's consent defense requires more than a consumer's general agreement to receive calls from unnamed entities. Everything Health's motion fails on the law for three separate and independent reasons: the consent forms do not identify Everything Health as the authorized caller; no signed, written agreement exists between Plaintiff and Everything Health; and the alleged electronic consent does not comply with the E-SIGN Act.

### 1. The Consent Forms Do Not Identify Everything Health as "the Seller," and Consent to Receive Calls from Other Entities Is Not Consent to Receive Calls from Everything Health.

The FCC's prior express written consent regulation requires, at minimum, a written agreement that "clearly authorizes *the seller* to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice…." 47 C.F.R. § 64.1200(f)(9) (emphasis added). The definite article—"the seller" rather than "a seller"—is deliberate and demands identification of the specific entity authorized to call. The FCC confirmed this in its 2012 Order, explaining that consent must show the consumer "will receive future calls that deliver prerecorded messages by or on behalf of *a specific seller.*" In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd 1830, 1844 (2012) (¶ 33) (emphasis added). Congress enacted the TCPA precisely to protect against the "intrusive invasion of privacy" caused by unrestricted telemarketing. *Mims v.*

*Arrow Fin. Servs., LLC,* 565 U.S. 368, 372 (2012). The seller-specificity requirement gives that protection meaning: consumers must know who they are authorizing to call them.

Plaintiff is aware that the FCC's December 2023 amendment to § 64.1200(f)(9)—which would have imposed a strict "one-to-one" consent requirement limiting each form to a single identified seller—was vacated by the Eleventh Circuit in *Insurance Marketing Coalition Ltd. v. FCC,* 127 F.4th 303 (11th Cir. 2025), and that the FCC formally reinstated the pre-2023 text by order adopted July 14, 2025, effective upon Federal Register publication on August 29, 2025, 90 Fed. Reg. 42,137. But that vacatur has no bearing on this case. The one-to-one rule said a consumer could authorize only one identified seller per individual consent—meaning a single checkbox could not grant consent to multiple callers at once. Plaintiff's argument is fundamentally different: *none* of the four forms names Everything Health at all. The "the seller" language was part of the original 2012 regulatory text, was not before the Eleventh Circuit in *Insurance Marketing Coalition,* was not challenged by any party, and was not affected by the vacatur. The pre-2023 text reinstated on August 29, 2025 still requires that the form "clearly authorize[] *the seller,*" still uses the definite article "the," and still demands that the calling entity be identified. Eliminating the one-to-one restriction means a single form may again list multiple sellers—but Everything Health does not appear on any of the four forms as even one of those sellers.

The seller-identification requirement is, in any event, independently and even more explicitly codified in the DNC Registry provision directly applicable to this case. Section 64.1200(c)(2)(ii) provides that calls to numbers registered on the National Do Not Call Registry are exempted from the prohibition on such calls only where consent is "evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by *this seller.*" 47 C.F.R. § 64.1200(c)(2)(ii) (emphasis added). The phrase "this

8

seller"—a demonstrative pronoun requiring specific, identified reference—leaves no ambiguity whatsoever. This provision was not amended by the 2023 one-to-one consent rule, was not challenged in *Insurance Marketing Coalition,* and is not implicated by the Fifth Circuit's recent decision in *Bradford v. Sovereign Pest Control of TX, Inc.,* No. 24-20379, 2026 U.S. App. LEXIS 5614 (5th Cir. Feb. 25, 2026). *Bradford* is non-binding Fifth Circuit authority that has not been adopted in the Eighth Circuit. Even under its reasoning, the requirement that consent be given to the specific entity placing the calls—here, Everything Health—is a foundational principle of consent law that survives any particular regulatory framework. Consent to be contacted by Medigap Life is not consent to be contacted by Everything Health. That is true whether the source is § 64.1200(f)(9), § 64.1200(c)(2)(ii), or the common law of consent itself.

Everything Health is "the seller" and "this seller" in this case—the entity whose insurance products were promoted in every call at issue. Yet its name appears in none of the four consent forms. The October 2023 form on onlygreatjobs.com authorized calls from "Medigap Life" and "Marketing Partners." DSUMF ¶ 11. The March 2024 form on higherincomejobs.com authorized calls from "Allied Insurance, Vincent Cortazar/Medigap Life, 100INSURE, Go Health, LLC, HealthPlanOne, LLC, ClearMatch Medicare, Medicare Solutions," among other names that do not include Everything Health. DSUMF ¶ 16. The September 2024 form authorized calls from "Innovative Financial Group." DSUMF ¶ 21. The February 2025 form authorized calls from "Single Parents Alliance of America (SPAOA), Holiday Relief (HR), American Hope Resources (AHR), Americas Health, Benefitlink." DSUMF ¶ 26. Everything Health Investments, LLC is named in none of them.

Courts have held that consent to receive calls from one or more specifically named entities does not constitute consent to receive calls from a different, unnamed entity. See, e.g., *Mantha v.*

*Quotewizard.com, LLC*, No. 19-12235-LTS, 2021 WL 6061919, at *8 (D. Mass. Dec. 3, 2021) (consent form "does not mention defendant or its clients by name"), report and recommendation adopted, 2022 WL 325722 (D. Mass. Feb. 3, 2022). The same analysis applies here with equal force: nothing in any of the four forms places a consumer on notice that "Everything Health Investments, LLC" would be calling.

Everything Health's motion does not cite a single case holding that consent to receive calls from Medigap Life, Innovative Financial Group, or the Single Parents Alliance of America constitutes consent to receive calls from Everything Health Investments, LLC. That is because no such case exists. The absence of Everything Health's name from all four forms is a complete legal bar to its consent defense under § 64.1200(f)(9), under § 64.1200(c)(2)(ii), and under basic principles of consent law, and summary judgment must be denied on this ground alone.

Defendant's cited authorities are readily distinguishable on their facts—and, critically, none involved a plaintiff who denied visiting the website at issue. In *Elkins v. Medco Health Solutions, Inc.*, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014), the plaintiff enrolled in her employer's health plan, provided her home telephone number on the enrollment form, and subsequently filled twelve prescriptions through the defendant—creating both prior express consent and an established business relationship with the very entity that called her. *Id*. at *18–19. The plaintiff did not dispute that she had enrolled or provided her number. In *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. 2014), the plaintiff personally booked airline tickets on the Hawaiian Airlines website and voluntarily entered her cellphone number in the "Contact Information" section; the defendant had a contractual relationship with Hawaiian Airlines to provide flight-notification services. *Baird*, 995 F. Supp. 2d at 1101–02. Again, the plaintiff did not dispute that she booked the flights or entered her number. And in *Oliver v. TTC-Ameridial, LLC*,

2018 U.S. Dist. LEXIS 39748 (N.D. Ill. Mar. 12, 2018), the defendant actually owned the website on which the consent form appeared, and the form expressly authorized calls from the website operator "or Marketing Partners." *Id*. at *3–4. The plaintiff admitted entering her information into the form; the dispute concerned only the legal sufficiency of the disclosure, not whether the plaintiff submitted it.

Here, by contrast, Everything Health does not own or operate any of the four websites, is not named in any consent disclosure, has no disclosed contractual relationship with any website operator, and—most fundamentally—Plaintiff has submitted a sworn declaration categorically denying that he ever visited any of these websites or submitted any information through them. None of Defendant's authorities supports summary judgment where the plaintiff denies the very act on which consent is predicated and the calling entity is absent from every consent form.

### 2. No Signed, Written Agreement Exists Between Plaintiff and Everything Health.

The FCC's prior express written consent regulation demands a signed, written agreement that, by its terms, involves both the person called and the seller who will be doing the calling. *See* 47 C.F.R. § 64.1200(f)(9) (defining prior express written consent as a signed written agreement "clearly authoriz[ing] the seller" to deliver telemarketing messages). The regulation contemplates a bilateral relationship: the consumer knowingly agrees, and the specific seller is clearly identified as the beneficiary of that agreement.

Nothing of the sort exists here. The four consent forms were displayed on websites owned and operated by third parties—Aragon Advertising LLC and others—entirely unrelated to Everything Health. Mr. Bernstein does not claim, and could not honestly claim, that Everything Health owned or operated any of these websites, designed or displayed any consent forms on them, or had any direct relationship with the consumers who submitted forms on them. He acknowledges

only that Everything Health "engages with third-party vendors to obtain leads." Bernstein Decl. ¶ 2. A lead generator's collection of consumer contact information does not create a signed, written agreement between that consumer and the downstream telemarketer who later purchases the lead data.

The requirement of a bilateral agreement is not a technicality; it is what separates genuine consent from manufactured consent. Consumers are not bound by terms they were not directed to and did not knowingly agree to. *See Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 35 (2d Cir. 2002) ("[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility."). Even accepting everything in the Bernstein Declaration at face value, the most that could be said is that someone agreed to receive calls from the entities named on those third-party websites—not from Everything Health.

3.   The Purported Electronic Consent Does Not Comply With the Federal E-SIGN Act.

When consent is obtained electronically through web forms, it must satisfy the requirements of the FCC's prior express written consent rule. The FCC has stated that consent obtained "in compliance with the E-SIGN Act will satisfy the requirements of [the] revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording." 27 FCC Rcd 1830, 1844 (2012) (¶ 34). The E-SIGN Act, 15 U.S.C. § 7001 et seq., provides the governing framework for determining whether an electronic signature and electronic record are legally valid. Consent that does not comply with the E-SIGN Act cannot be given legal effect as an electronic substitute for a written agreement. See *Mantha*, 2021 WL 6061919, at *8–9 (holding consent form invalid where it lacked the disclosures required by 15 U.S.C. § 7001(c) and 47 C.F.R. § 64.1200(f)(9)).

The E-SIGN Act requires that before an electronic record may substitute for a statutory writing, the consumer must receive, among other things: a clear and conspicuous statement of the right to receive non-electronic records and the right to withdraw consent (including any conditions, consequences, or fees upon withdrawal), § 7001(c)(1)(B)(i); a description of the procedures to withdraw consent, § 7001(c)(1)(B)(iii); and a statement of the hardware and software requirements for access to and retention of the electronic records, § 7001(c)(1)(C)(i). See 15 U.S.C. § 7001(c)(1). The consent records produced by Everything Health—form submissions on third-party job, income, and nonprofit websites—contain none of these disclosures. Defendant does not address the E-SIGN Act anywhere in its moving brief. The forms plainly do not contain E-SIGN–compliant disclosures, and the purported electronic consent is legally insufficient for this independent reason as well.

## B. THE CONSENT EVIDENCE IS INADMISSIBLE AND CANNOT SUPPORT SUMMARY JUDGMENT.

A party may object that the material cited to support or dispute a fact "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Everything Health's consent evidence fails this standard on two independent grounds.

### 1. Mr. Bernstein Cannot Authenticate Records Created and Maintained by Third Parties.

Under Federal Rule of Evidence 901(a), "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Where the accuracy of a result depends on a process or system, the proponent may satisfy this standard by presenting "evidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9). Courts applying this standard to third-party electronic records have held that authentication requires sworn testimony from a person with personal knowledge of that third

13

party's record-keeping systems, processes, and accuracy—not merely a declaration from the party who received the records.

The court confronted this precise problem in *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852 (N.D. Ill. 2024), a TCPA case where the defendant sought to establish consent through third-party lead data. The court held that proper authentication under Rule 901 required sworn testimony from a person with "personal knowledge of facts necessary to lay a foundation to testify that" the third-party records are what they purport to be. *Hossfeld*, 726 F. Supp. 3d at 874. The defendant's own witness, who merely received and reviewed the records, could not supply that foundation. *Id.* Because the records were unauthenticated, the court held that "[s]ince the spreadsheet and witnesses' testimony based on it [were] inadmissible," the lack of consent was deemed undisputed, and the court granted summary judgment in favor of the plaintiff. *Id.* at 874.

Everything Health's submission suffers from the same fatal defect. Mr. Bernstein is the managing partner of Everything Health, not an employee of Verisk Marketing Solutions or ActiveProspect. The Verisk TCPA Guardian reports were prepared for Aragon Advertising LLC, as their cover page expressly states. Ex. A (EHI 00002, 00007). Mr. Bernstein does not claim any personal knowledge of: (i) how Verisk's Guardian system captures and encrypts lead event data; (ii) how Verisk confirms that a particular individual—rather than a bot—entered information into a form; (iii) how ActiveProspect generates TrustedForm certificates or records event logs; or (iv) how any of the four third-party websites operated. He simply attests that he reviewed records produced by others and, in his view, they show consent. Bernstein Decl. ¶¶ 4–6. An interested declarant's conclusion about what third-party records mean is not evidence that those records are authentic.

Without authentication from Verisk, ActiveProspect, or the operators of the four websites—none of whom has submitted any declaration in this case—Exhibit A is unauthenticated and inadmissible. The authentication deficit alone renders Everything Health's entire evidentiary submission insufficient to support summary judgment.

Exhibits B, C, and D—the three screen recordings of Verisk Visual Playback sessions—suffer from an even more acute authentication problem. To create these recordings, someone with access to Verisk's subscriber portal (presumably defense counsel or Everything Health's representatives) logged in, pulled up the playback for each lead event, and recorded their screen. No Verisk employee has submitted a declaration authenticating these videos. No one has attested that the Visual Playback system accurately and completely reproduces the original lead event. No one has explained whether the playback can be paused, skipped, or edited, or whether what is shown reflects the entirety of the original session. Tellingly, all three videos appear to begin mid-session, without any footage showing the start of the interaction. Under Rule 901(b)(9), authentication of a technological process or system calls for "evidence describing a process or system and showing that it produces an accurate result." Nothing in the Bernstein Declaration or anywhere else in Defendant's submission satisfies that standard for the video exhibits. They are unauthenticated and inadmissible.

2.    The Consent Records Constitute Multiple Layers of Inadmissible Hearsay.

"Hearsay" is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is inadmissible unless a recognized exception applies. Fed. R. Evid. 802. Where a statement contains hearsay within hearsay, each layer must independently satisfy a hearsay exception. Fed. R. Evid. 805.

The consent records here contain at least four layers of hearsay, none of which satisfies an exception through Mr. Bernstein's declaration. The **first layer** is the alleged online form submission itself—an out-of-court implied assertion, purportedly by Plaintiff, that he visited the website and agreed to the disclosed consent terms. The **second layer** is the third-party website's system recording of that submission. The **third layer** is Aragon Advertising's provision of the lead data to Verisk and Everything Health. The **fourth layer** is the Verisk Guardian report and the TrustedForm certificate, each summarizing and interpreting what the underlying system recorded. Every one of these layers is offered to prove the truth of the matter asserted—that Plaintiff consented—and none is authenticated or independently excepted from the hearsay rules.

In *Hossfeld,* the court identified an analogous problem. The defendant's consent evidence comprised multiple layers of hearsay because the leads spreadsheet was generated by a third party, passed through an intermediary, and introduced through a witness with no personal knowledge of its underlying data. *Hossfeld,* 726 F. Supp. 3d at 873. The court specifically found that the defendant had "not laid an evidentiary predicate tracing the hearsay statements in the spreadsheet to their source, i.e., the data and statements that underly them." *Id.* at 873. The business records exception, Fed. R. Evid. 803(6), cannot save the records because no custodian or qualified witness of Verisk, ActiveProspect, or any of the four websites has testified or provided a certification complying with Rule 902(11) or (12) to lay the required foundation. *Hossfeld* confirms the broader principle: where "no exception or exemption has been established" for multiple layers of hearsay in third-party lead data, the evidence is inadmissible. *Hossfeld*, 726 F. Supp. 3d at 873. The court granted the plaintiff's motion for summary judgment on the TCPA claim. The same result is compelled here: without a single witness from Verisk, ActiveProspect, Aragon Advertising, or any

of the four websites, Everything Health's multiple layers of hearsay cannot be admitted and its evidentiary case collapses entirely.

## C. WHETHER PLAINTIFF VISITED THE WEBSITES AND SUBMITTED THE FORMS IS A GENUINE DISPUTE OF MATERIAL FACT.

Even assuming the consent evidence were legally sufficient and admissible—it is neither—summary judgment would still be improper because whether Plaintiff actually visited the four websites and submitted his personal information is a genuine dispute of material fact. It is not Plaintiff's burden to prove he did not consent; it is Defendant's burden to prove he did. *See Blow,* 855 F.3d at 803; *Van Patten*, 847 F.3d at 1044. Plaintiff's sworn declaration, combined with the implausibility of the alleged visits, the suspicious characteristics of the TrustedForm event log, and the internal inconsistencies in Defendant's own records, collectively preclude summary judgment.

### 1. Plaintiff Has Categorically and Consistently Denied Every Alleged Website Visit.

Plaintiff has submitted a sworn declaration under penalty of perjury stating: "I did not visit, submit any information on, or otherwise interact with the website onlygreatjobs.com, including on or around October 10, 2023, or at any other time." Blubaugh Decl. ¶ 6. "I did not visit, submit any information on, or otherwise interact with the website higherincomejobs.com, including on or around March 24, 2024, or at any other time." *Id.* ¶ 7. "I have never visited any website that offers Medicare quotes, health insurance quotes, or similar insurance-related services through multi-company 'marketing partner' forms. I have never filled out any such form." *Id.* ¶ 8. "I did not provide prior express consent—written or otherwise—to Defendant or to any entity acting on Defendant's behalf to contact me by telephone for marketing or advertising purposes." *Id.* ¶ 14.

This sworn testimony creates a genuine dispute of material fact. Credibility determinations are for the jury. *Torgerson,* 643 F.3d at 1042. At summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Plaintiff is not required to prove a negative; the burden of proving consent rests squarely on Everything Health. *See Blow*, 855 F.3d at 803; *Van Patten,* 847 F.3d at 1044.

A materially analogous scenario arose in *Clotz v. Federal Savings Bank*, No. 22 CV 3755, 2024 U.S. Dist. LEXIS 249080 (N.D. Ill. Feb. 21, 2024), where the defendant produced Jornaya-verified lead records showing the plaintiff's own IP address, email, and personal information had been submitted to a third-party lead-generation website. The plaintiff denied ever visiting the site, and his browsing history did not show it. The court denied summary judgment, holding that this created "conflicting evidence as to whether [plaintiff] actually visited [the website] on the date in question" that "precludes granting summary judg[ment]." *Id*. at *5–6. The court further held that the plaintiff's deposition testimony alone was "sufficient on its own to create an issue of material fact." *Id*. at *6. The evidence for Plaintiff here is even stronger: he not only categorically denies the visits, but offers concrete, verifiable reasons why those visits would have made no sense.

2.     Plaintiff's Specific Circumstances Make the Alleged Website Visits Implausible.

Plaintiff already receives comprehensive health insurance through Medicare and Medicaid at absolutely no cost to him. Blubaugh Decl. ¶¶ 4–5. He has no need to shop for, compare, or purchase health insurance, Medicare supplement plans, or Medicare Advantage products of the kind marketed in Everything Health's calls. *Id.* ¶¶ 5, 10. He has not been employed full-time in approximately ten to twelve years and has earned approximately $2,000 over the past two years. *Id.* ¶¶ 2–3.

The websites themselves are not insurance platforms. Onlygreatjobs.com is a job listings site. Higherincomejobs.com promotes income opportunities. Relief.spaoa.org is the website of the Single Parents Alliance of America—a nonprofit. A person who already has free, comprehensive health coverage and is not in the market for any insurance product would have no apparent reason to visit any of these three sites, let alone to navigate buried insurance-consent disclosures on each one. The implausibility of the alleged visits powerfully corroborates Plaintiff's denial and supports the inference that the forms were submitted by someone—or something—other than Mr. Blubaugh.

3.      <u>Defendant's Own Video Exhibits and the TrustedForm Event Log Confirm Automated Activity, Not Human Interaction.</u>

The most remarkable feature of this case is that Defendant's own evidence—the three screen recording exhibits it filed to prove consent (Exhibits B, C, and D)—actually confirms Plaintiff's account rather than Defendant's. A review of those video exhibits reveals that in all three recordings, the form fields containing Plaintiff's personal information at times appear pre-populated without any visible human typing. Sometimes no person is shown manually entering Plaintiff's name, phone number, or email address into any of the three forms; the data is simply already present in the fields at the outset of what is recorded. This is the defining hallmark of automated form submission: a bot injects pre-scraped personal data programmatically into form fields, bypassing the keyboard entirely, because there is no human at the keyboard. Defendant's own video exhibits prove the point.

Beyond the pre-filled fields, all three videos display additional indicators of non-human interaction. The mouse movements visible in the recordings are mechanical and do not reflect the variable, organic quality of ordinary human hand movement. Rapid, unnatural keystroke patterns are also visible. Most significantly, all three recordings begin mid-session—there is no footage

19

showing how the user arrived at the form page, how the form was first loaded, or what occurred at the very beginning of the alleged interaction. A person voluntarily navigating to a website and deliberately deciding to fill out a form generates a complete, traceable session. A bot executing a pre-programmed routine on a partially captured session generates exactly what these videos show: a recording that begins in media res with data already present and interactions already underway.

The TrustedForm event log for the February 11, 2025 SPAOA lead event independently corroborates what the videos show. That log records over 100 events, dominated by dozens upon dozens of sequential Backspace keystrokes entered into the phone-number field. Ex. A (EHI 00012–00013). A human user typing a 10-digit telephone number does not generate this pattern. Automated bots that pre-fill scraped data, misfire on field formatting, and retry in rapid sequence do. The log contains additional corroborating details:

- The session began at 4:21 AM CST—an hour wholly inconsistent with a consumer browsing a nonprofit relief organization's website to seek health insurance information. Ex. A (EHI 00010).
- A different telephone number—"(816) 466-4350"—was briefly entered into the phone field and then overwritten before Plaintiff's number appeared, consistent with automated pre-fill logic entering the wrong value and self-correcting. Ex. A (EHI 00014).
- The form was submitted twice within the same session, inconsistent with deliberate human behavior but consistent with automated retry logic. Ex. A (EHI 00012-00013).

Verisk's own documentation confirms that Guardian is limited to recording factual information about the lead event environment and does not capture or store personally identifiable consumer data. Ex. A (EHI 00002, 00007). Nothing in Verisk's system purports to confirm that the individual whose data appears in a form was the person who submitted it, and the system

contains no apparent mechanism for detecting automated bot activity. Taken together, the pre-populated fields visible in all three of Defendant's own video exhibits, the mechanical mouse movements, the unnatural keystrokes, the mid-session start of every recording, the 4:21 AM submission time, the mass Backspace sequences in the TrustedForm log, and the double form submission paint a coherent, consistent picture: an automated system submitted Plaintiff's scraped personal data without his knowledge or consent. The Court need look no further than Defendant's own exhibits to find a genuine dispute of material fact.

4.  Defendant's Own Lead Records Contain Internal Inconsistencies That Undermine Its Position.

The Request for PTC document for the September 2024 lead event (EHI 00017) records an IPv6 address of "2600:100a:b032:8984:0:1e:d7e5:d301." The Verisk report for the October 2023 event records IP address 174.250.192.19, and the Verisk report for the March 2024 event records IP address 70.118.232.83. Ex. A (EHI 00003, 00008). Different IP addresses across purported submissions by the same person, combined with an IPv6 address appearing in the CRM system for the September 2024 event, are precisely the kind of internal inconsistencies that create reasonable doubt about whether the same person—or any human at all—generated these leads.

In *Clotz*, the court denied summary judgment even though the lead records consistently linked the plaintiff's own IP address and email to the website submission, holding that the plaintiff's sworn denial was "sufficient on its own to create an issue of material fact." *Clotz*, 2024 U.S. Dist. LEXIS 249080, at *6. Here, the case for denial is even stronger: Everything Health's own records contain internal inconsistencies—varying IP addresses across four purportedly related submissions and an IPv6 address that does not match the corresponding Verisk report—that independently undermine the reliability of the lead data.

Everything Health's evidentiary submission is also facially incomplete. The MSJ identifies four separate alleged consent events: October 10, 2023; March 24, 2024; September 10, 2024; and February 11, 2025. DSUMF ¶¶ 7–28. For three of those events, Defendant filed screen recordings of Verisk Visual Playback sessions as Exhibits B, C, and D. For the fourth—the September 10, 2024 event, which Defendant attributes to a Medicare-related advertisement and identifies "Innovative Financial Group" as the authorized caller—Defendant has produced no visual playback, no screen recording, and no equivalent contemporaneous evidence of the alleged consent interaction. DSUMF ¶¶ 19–21. The only support for that event is Mr. Bernstein's interested declaration, which attests only that he "reviewed" records that purport to show consent. Bernstein Decl. ¶ 4.

Even on its own terms, therefore, Defendant has not produced the same quality of evidence for all four alleged consent events. The September 2024 event—for which Defendant bears the burden of proof—is supported by less evidence than the other three, and even those three, as demonstrated above, affirmatively undermine Defendant's position. Everything Health cannot carry its summary judgment burden on an incomplete record of its own making.

## V. THE ALTERNATIVE MOTION TO STRIKE CLASS ALLEGATIONS SHOULD BE DENIED.

As an initial matter, Defendant's request to strike Plaintiff's class allegations is procedurally improper and should be denied for the independent reason that it violates this Court's prior Order. In its February 12, 2026 Order, the Court directed Defendant to file a dispositive motion addressing the merits of Plaintiff's claims. (ECF No. 14). The Court subsequently extended

that deadline but did not expand the scope of permitted relief. (ECF No. 16). Defendant nevertheless filed a combined motion seeking not only summary judgment under Rule 56, but also, "in the alternative," to strike Plaintiff's class allegations under Rule 12(f). (ECF No. 17). By embedding a motion to strike within its summary judgment filing, Defendant violated the Court's Order, which was limited to a dispositive motion on the merits—not a premature challenge to the pleadings—and its motion to strike should be denied on that basis alone.

The motion substantively fails as well. Although the Eighth Circuit has recognized that a district court may strike class allegations before a certification motion is filed, this drastic remedy is appropriate only where it is "apparent from the pleadings that the class cannot be certified." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1092 (8th Cir. 2021) (quoting Wright & Miller, Federal Practice and Procedure § 1383). That standard is not met here. This is consistent with federal court practice in TCPA cases. Indeed, class certification is usual in TCPA litigation because the main questions are common to all recipients. *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016). Consequently, allowing such a motion is uncommon and courts "should typically await the development of a factual record." *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 318 (D. Mass. 2020) (denying similar motion in TCPA class action in which Defendant's counsel represented the defendant, and collecting cases); *see also Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93-95 & n.30 (3d Cir. 2011) (holding that a court may deny class certification before discovery only if the "complaint itself demonstrates that the requirements for maintaining a class action cannot be met," and explaining that "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented"); *Medina v. Enhanced Recovery Co.*, No. 15-14342, 2017

U.S. Dist. LEXIS 186651 (S.D. Fla. Nov. 9, 2017) ("Defendant's belief that Plaintiff's claims ultimately will fail due to the need for individualized inquiry does not, at this stage of proceedings, prohibit discovery on these issues.").

Indeed, class certification is usual in TCPA litigation because the main questions are common to all recipients. *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016). Consequently, allowing such a motion is uncommon and courts "should typically await the development of a factual record." *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 318 (D. Mass. 2020) (denying similar motion in TCPA class action in which Defendant's counsel represented the defendant, and collecting cases).

The Plaintiff's proposed class definition do rely on objective criteria and are not failsafe. A class is not fail-safe if "[m]embership … can be determined without reaching any legal conclusions to determine whether someone is in the class, one simply needs to answer questions … determined by objective criteria." *Panacci v. A1 Solar Power, Inc.*, No. 15-cv-00532-JCS, 2015 WL 3750112, at *8 (N.D. Cal. June 15, 2015) (internal annotations omitted and denying motion to strike in TCPA case). Contrary to what Defendant argues, to determine class membership in this case, even based on the current class definitions, the Court would be required to ask only objective, factual questions, including, the following ones:

For the National Do Not Call Registry Class:

- Did the putative class member receive calls from Defendant marketing insurance products or services?
- Was the putative class member's telephone number subscribed to a residential telephone service as opposed to a business telephone service?
- Was the putative class member's number on the National Do Not Call Registry for more than 30 days before it was called?
- Did the putative class member receive two or more calls in a one year period?

*See id*. at \*8-9 (finding that the plaintiff's proposed class were not fail safe because "one simply needs to answer questions such as whether the person is on a DNC registry or whether the person received a certain number of phone calls from Defendants within a certain timeframe").

The Defendant's allusion to potential consent and established business relationship defenses are not enough to find Plaintiff's classes uncertifiable at this or any other stage. *See, e.g., Mohamed v. Off Lease Only*, 320 F.R.D. 301, 316 (S.D. Fla. 2017) ("conclusory argument" about prior express consent cannot defeat predominance); *Reyes v. BCA Fin. Servs.*, No. 16-24077-CIV, 2018 U.S. Dist. LEXIS 106449, at \*43 (S.D. Fla. June 26, 2018) ("unadorned consent defenses will not defeat class certification"). Indeed, courts have forcefully rejected permitting class allegations to be stricken prior to any discovery in a TCPA case based on such speculation. *See, e.g., Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016) (holding in a TCPA case that "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)" and that "allowing such speculation to dictate the outcome of a class-certification decision would afford litigants in future cases wide latitude to inject frivolous issues to bolster or undermine a finding of predominance.").

This conclusion is reinforced by Judge Harpool's recent decision in *Robertson v. Mortgage Research Center, LLC*, 2024 U.S. Dist. LEXIS 221676 (W.D. Mo. Dec. 9, 2024). There, the defendant moved to strike TCPA class allegations on the ground that some putative class members may have consented to the communications or maintained business relationships that could defeat liability. Judge Harpool rejected that argument, holding that "whether Plaintiff will be able to certify a class with regard to her claims is unknown at this time," that discovery would determine whether the case was "amenable to class certification," and that the plaintiff had alleged "a facially certifiable class." Id. at \*4–5. He further explained that "[s]imply because Defendant believes

25

Plaintiff's claims will fail does not mean the Court has a basis to strike the claims or allegations at this preliminary stage of the litigation," and held that "the parties should be afforded an opportunity to conduct discovery and present evidence on the issues raised by Plaintiff's class action allegations and that a motion to strike is premature." Id. at *5. The same is true here. Defendant's contention that consent or other individualized issues may arise is not a basis to strike class allegations now, before class discovery and before Plaintiff has had any opportunity to develop the Rule 23 record.

Everything Health's entire premise for striking class allegations is that Plaintiff's purported consent makes him atypical and inadequate to represent the class. But as demonstrated throughout this brief, that consent defense is legally insufficient, evidentiary deficient, and factually disputed at every level. A defendant cannot bootstrap a disputed affirmative defense into a basis for striking class allegations. Where, as here, the named plaintiff squarely denies ever providing consent and the defendant's own evidence is unreliable and contested, the issue of consent is a common merits question—not a basis for disqualification. If anything, Plaintiff's circumstances are representative of the class he seeks to represent: individuals who received telemarketing calls from Defendant without providing valid prior express written consent. Plaintiff's claim arises from the same course of conduct as the class: Defendant's alleged practice of placing telemarketing calls without valid consent. The fact that Defendant asserts a consent defense against Plaintiff does not render him inadequate or atypical; if it did, TCPA class actions would rarely, if ever, proceed. Thus, because it is far from "apparent from the pleadings" that class certification cannot be achieved, *Donelson*, 999 F.3d at 1092, the motion to strike is premature and should be denied.

## VI.   CONCLUSION

For all of the foregoing reasons, Plaintiff Jeffery Blubaugh respectfully requests that this Court deny Defendant's Combined Motion for Summary Judgment and, in the Alternative, Motion to Strike Class Allegations in its entirety, allow this action to proceed to class certification and trial, and, consistent with ECF No. 14, address the merits of Plaintiff's pending discovery dispute.

Dated: April 2, 2026                    Respectfully submitted,

By: */s/ Anthony Paronich*
Anthony Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
anthony@paronichlaw.com
Attorney for Plaintiff and the Putative Class
(*Pro Hac Vice*)

M. Cory Nelson, MO # 63357
MCN Law LLC
8600 W. 110th Street, Suite 214
Overland Park, KS 66210
Tel: (913) 358-5800
mcorynelson@mcnlawllc.com
*Local Counsel for Plaintiff and the Putative Class*

27