| | |
|---|---|
| JEFFREY BLUBAUGH, individually and on behalf of a class of all persons and entities similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>EVERYTHING HEALTH INVESTMENTS, LLC,<br><br>        Defendant. | Case No: 4:25-cv-00527 |

**DEFENDANT'S REPLY SUGGESTIONS IN SUPPORT OF ITS COMBINED MOTION FOR SUMMARY JUDGMENT AND SUGGESTIONS IN SUPPORT OR, IN THE ALTERNATIVE, MOTION TO STRIKE CLASS ALLEGATIONS**

Everything Health Investments, LLC ("Defendant") by and through undersigned counsel, respectfully submits these Reply Suggestions in Support of its Combined Motion for Summary Judgment and Suggestions in Support or, in the Alternative, Motion to Strike Class Allegations (Doc. 17). Plaintiff's opposition brief raises a series of arguments that are legally flawed, factually unsupported, or both. None of them overcomes the undisputed documentary evidence of Plaintiff's prior express written consent, and none of them defeats Defendant's motion.

### i. Plaintiff's Suggestions in Opposition Do Not Comply With Local Rule 56.1(b)

Local Rule 56.1(b) sets forth the requirements for suggestions in opposition to a motion for summary judgment. The rule states: "A party opposing a motion for summary judgment must begin its opposing suggestions by admitting or controverting each separately numbered paragraph in the movant's statement of facts. If the opposing party controverts a given fact, it must properly support its denial in accordance with Fed. R. Civ. P. 56(c). Unless specifically controverted by the

1

opposing party, all facts set forth in the statement of the movant are deemed admitted for the purpose of summary judgment." Plaintiff has plainly ignored this requirement. Accordingly, all facts set forth in Defendant's Motion should be deemed admitted. Plaintiff has failed to create a genuine issue of material fact and the Motion should be granted on this basis alone.

### ii. The Consent Forms Satisfy the TCPA's Prior Express Written Consent Requirement

The undisputed facts show that on four separate occasions, Plaintiff visited different websites, provided his personal information, and consented to calls. A written agreement, such as the agreements at issue here, establishes consent, as it includes a clear and conspicuous disclosure informing Plaintiff that (1) by signing the agreement, the consumer is authorizing autodialed telemarketing or advertising calls or texts, and (2) the consumer is not required to sign the agreement as a condition of purchasing any property, goods, or services. *See* 47 C.F.R. § 64.1200(f)(9)(i). Each of the consent forms complies with the prior written consent requirements of the TCPA.

The October 10, 2023 and March 24, 2024 consents feature the same disclosure language. They (1) state by "clicking I agree & continue" you agree to the terms and consent to "Marketing Partners" to contact you with marketing calls or texts at the phone number you provided; and (2) "Consent isn't required." *See* Doc. 17, ¶¶ 11, 16. The disclosure language is placed between the information forms and the "Continue" button, which would require the user to see the disclosure before moving forward. *See* Doc. 17, Ex. B, C. The disclosures also feature a check box next to the disclosure. *See* Doc. 17, Ex. B, C.

The September 10, 2024 consent (1) states by "clicking 'Yes,' I provide my express written consent via this web form" to be contacted; and (2) the user is "not required to enter into this agreement as a condition of any purchase or service." *See* Doc. 17, ¶ 21. This disclosure is at a

99224\329307913.v1

parallel level to the "Yes" button and does not require scrolling to see the disclosure. *See* Doc. 17, Ex. A.

The February 11, 2025 consent (1) states by "clicking 'Click To See Your Results' I give my electronic signature agreeing to the Terms" and consent to be contacted by "Marketing Partners" regarding various offers; and (2) the disclosure states that consent is "not required to use SPAOA's service." *See* Doc. 17, ¶ 26. The disclosure language is placed between the information forms and the "Click To See Your Results" button, which would require the user to see the disclosure before moving forward. *See* Doc. 17, Ex. D.

Each of these agreements were placed directly above or next to the buttons affirming consent. They all satisfied the clear and conspicuous requirement to establish consent. Notably, a consumer's completion of an online form is sufficient to meet the statutory "signed, written agreement" standard under the TCPA. *See In re Rules & Regulations Implementing the TCPA of 1991*, 27 FCC Rcd 1830, 1844 (2012). Under this framework, consent is established so long as the individual had reasonable notice that interacting with a website—whether by navigating the site or clicking a particular button—would operate as agreement to the relevant terms. *Acaley v. Vimeo, Inc.*, 464 F. Supp. 3d 959, 965 (N.D. Ill. 2020) (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016)); *see also Sullivan v. All Web Leads, Inc.*, 2017 WL 2378079 at *7 (enforceability under contract law turns on whether the individual had reasonable notice of the terms and undertook some affirmative conduct reasonably interpreted as manifestation of assent).

### iii. The Consent Forms Satisfy the TCPA's Seller-Identification Requirement

The consent disclosures at issue do not merely authorize calls from specifically named entities; they expressly authorize calls from "Marketing Partners" and "agents." Plaintiff voluntarily entered his personal information and affirmatively clicked to consent to calls not only

from the named entities but also from their marketing partners. Everything Health is precisely the type of downstream marketing partner contemplated by these disclosures.

The court in *Oliver v. TTC-Ameridial, LLC* found identical "or Marketing Partners" language sufficient to establish prior express written consent. 2018 U.S. Dist. LEXIS 39748, at *3–4 (N.D. Ill. Mar. 12, 2018). There, the consent disclosure stated that the consumer agreed to receive calls "from online-edu-help.com or Marketing Partners," and the court held that this language provided valid consent to receive telemarketing calls from TTC-Ameridial, the entity that actually placed the calls. Similarly, in *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. 2014), the court found consent sufficient where the plaintiff provided her phone number through a web portal and a third-party entity—Sabre, Inc.—was the entity that actually contacted her pursuant to a contractual relationship with the website operator.

Plaintiff attempts to distinguish *Oliver* on the basis that TTC-Ameridial "actually owned the website on which the consent form appeared." This distinction is immaterial. The Oliver court's holding did not turn on website ownership; it turned on the sufficiency of the consent disclosure language and whether the calls fell within its scope. The "Marketing Partners" language was what provided the consent, not ownership of the website.

Plaintiff's argument that the TCPA requires a "bilateral agreement" between the consumer and the specific caller is without merit. To support the assertion of a "bilateral agreement," Plaintiff cites to *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35, (2d. Cir. 2002), which is not a TCPA case and has nothing to do with internet-based telemarketing communication consent forms. *Specht* dealt with agreement to software licensing terms and turned on issues of conspicuous notice, not party identification. *Id*.

99224\329307913.v1

Plaintiff concedes that the FCC's one-to-one consent rule was vacated by the Eleventh Circuit in *Insurance Marketing Coalition Ltd. v. FCC*, 127 F.4th 303 (11th Cir. 2025), and that the FCC reinstated the pre-2023 regulatory text. *Insurance Marketing Coalition* entirely undermines Plaintiff's position that the consumer must agree to the specific caller. Courts have explicitly held that parties that receive contact information indirectly may have consent to communicate with those individuals pursuant to the TCPA. *See, e.g.. Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 793 (9th Cir. 2018). The consent forms here do precisely what the pre-2023 regulations permit: they authorize calls from named entities and their marketing partners, providing Plaintiff with notice that other entities in the marketing chain would contact him.

Plaintiff's argument that Everything Health must be named by its specific corporate name in each consent form finds no support in the pre-2023 regulatory text or in Eighth Circuit authority. Plaintiff argues that § 64.1200(c)(2)(ii), which governs calls to numbers on the National Do Not Call Registry, requires consent "evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller." Plaintiff contends that the demonstrative pronoun "this seller" forecloses consent through marketing-partner language. This reading is unsupported by the text. The phrase "this seller" does not impose a requirement that the entity's full legal name appear in the disclosure. Plaintiff has cited to no caselaw to support his position, because none exists. Where a consent form authorizes calls from marketing partners and Everything Health operates as such a partner, the consent encompasses Everything Health as "this seller."

### iv. The Consent Evidence is Admissible

Plaintiff challenges the admissibility of Defendant's consent records on the basis that Eric Bernstein, Everything Health's managing partner, lacks personal knowledge of how Verisk

5

99224\329307913.v1

Marketing Solutions and ActiveProspect generate their records. Plaintiff relies heavily on *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852 (N.D. Ill. 2024), for the proposition that only a witness from the third-party record-keeper can authenticate these records.

*Hossfeld* is distinguishable. In *Hossfeld*, the defendant's sole evidence of consent was a leads spreadsheet with no corroborating evidence. Here, Defendant has produced screen recordings of playback sessions (Ex. B, C, and D) and four separate consent forms (Ex. A) from four different dates—each bearing Plaintiff's personal information, including his name, telephone number ending in 2682, and email address. The sheer volume and consistency of these records across multiple platforms and dates provides circumstantial indicia of reliability sufficient for authentication under Fed R. Evid 901(b)(4) (distinctive characteristics) and Fed R. Evid 901(b)(9) (process or system).

Moreover, the standard at summary judgment does not require that evidence be presented in its final admissible form; it requires only that the evidence "can be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The lead verification records at issue are (1) largely machine-generated data not constituting hearsay and (2) in any event admissible as business records supported by custodian testimony from the entities that generate and maintain them. Defendant can and will present testimony from Verisk and ActiveProspect representatives at trial to authenticate the records. The summary judgment standard requires only a showing that such testimony is available, not that it has already been presented. *Gannon Int'l., Ltd. v. Blocker*, 634 F.3d 785, 793 (8th Cir. 2012). To the extent additional foundation is required, it can be readily supplied, and Defendant requests leave to do so.

Plaintiff repeatedly emphasizes that the Verisk TCPA Guardian reports are stamped "Prepared for Aragon Advertising LLC," not Everything Health, and argues this undermines the evidentiary chain. However, this argument does not support the position that the reports are

99224\329307913.v1

unreliable. Aragon is a lead generation vendor that purchases Verisk's services on behalf of its downstream clients, and the reports were generated in connection with leads ultimately sold to Everything Health. The stamp is a distinction without consequence. Nothing about the reports being prepared for Aragon renders them unreliable.

Plaintiff's hearsay argument similarly fails. The Verisk TCPA Guardian reports and TrustedForm certificates are records of regularly conducted activity within the meaning of Federal Rule of Evidence 803(6). These are automated records generated by software systems in the regular course of business, and they are the type of records that are routinely admitted under the business records exception. Rule 902(11) and (12) permit authentication through written certification rather than live testimony. Defendant can cure any foundational deficiency through appropriate certifications.

### v. Plaintiff's Declaration Does Not Create a Genuine Dispute of Material Fact

Plaintiff's sworn declaration categorically denying that he ever visited any of the four websites or submitted any information is the centerpiece of his opposition. Plaintiff relies on *Clotz v. Federal Savings Bank*, 2024 U.S. Dist. LEXIS 249080 (N.D. Ill. Feb. 21, 2024), for the proposition that a sworn denial alone creates a triable issue.

But Plaintiff's declaration must be weighed against the overwhelming documentary evidence contradicting it. Four separate consent events—occurring on four different dates across sixteen months, on four different websites, each bearing Plaintiff's personal information—constitute significant evidence that Plaintiff did, in fact, visit these websites and submit his information. The consistency of Plaintiff's data across multiple independent platforms (his name "Jeff Blubaugh," his phone number ending in 2682, his email "jrblubaugh@gmail.com," his date

99224\329307913.v1

of birth) undermines Plaintiff's entirely unsupported lay opinion that these consent forms were created as the result of automated bot activity.

Furthermore, Plaintiff's suggestion that he had "no reason" to visit these websites because he already has Medicare and Medicaid coverage is a non-sequitur. Many of the consent forms concerned Medicare Advantage and Medicare Supplement products, which are precisely the types of plans that Medicare recipients explore. The fact that Plaintiff already has government-sponsored coverage does not mean he would never investigate supplemental or replacement options. Indeed, the marketing of Medicare Advantage plans to existing Medicare beneficiaries is one of the largest sectors of the health insurance marketing industry.

*Clotz* is also distinguishable. In *Clotz*, the court noted that the plaintiff's browsing history did not show the website, providing independent corroboration of the denial. Here, Plaintiff has offered no independent corroboration whatsoever—no browsing history, no device records, no testimony from any witness. His bare declaration, standing alone and contradicted by four documented consent events, should not suffice to defeat summary judgment.

### vi. Plaintiff's E-SIGN Act Argument is Inapplicable

Plaintiff's argument that the consent forms do not comply with the E-SIGN Act is completely inapplicable to this case. The E-SIGN Act requires consent to be accompanied by certain disclosures, but only applies to some statutes. The E-SIGN Act does not apply to the TCPA. *Reinert v. Power Home Remodeling Grp., LLC*, No. 19-13186, 2020 WL 6743094, *3 (E.D. Mich. Nov. 17, 2020); *see also Morris v. Modernize, Inc.*, No. AU-17-CA-00963-SS, 2018 WL 7076744, at *3 (W.D. Tex. Sept. 27, 2018) (the E-Sign Act disclosures do not apply to the TCPA). There are no cases in the Eighth Circuit that find consent must be obtained in compliance with the E-SIGN Act.

### *vii. Plaintiff's Arguments Regarding the Video Exhibits and Event Logs Do Not Preclude Summary Judgment*

Plaintiff devotes substantial attention to his characterization of the Verisk Visual Playback recordings and the TrustedForm event log, arguing that pre-populated fields, mechanical mouse movements, and sequential backspace keystrokes suggest automated bot activity rather than human interaction.

Plaintiff's interpretation of the video evidence is speculative and based entirely on his counsel's lay characterization of technical data. Plaintiff has submitted no expert testimony interpreting the Visual Playback recordings, the TrustedForm event log, or the keystroke patterns. His suggestion that "pre-populated" fields indicate bot activity ignores common browser autofill functionality, which routinely pre-populates name, address, phone, and email fields when a user begins typing or clicks on a form field. Modern browsers and devices store and auto-fill personal information across fields simultaneously. Similarly, the sequential backspace keystrokes in the event log are entirely consistent with a human user correcting a mistyped phone number (or an auto-filled phone number that a human user wishes to change), not with bot activity. The fact that a session began at 4:21 AM proves nothing; people use the internet at all hours. Plaintiff also points out that the event log indicates two events in which the form was submitted, and suggests this is incompatible with human behavior. However, it is apparent from the event log that Mr. Blubaugh initially submitted the form with missing phone number information, entered his phone number information after initially clicking to submit, and then clicked submit again once he added the phone number. *See* Ex. A. Further, this is confirmed in the video playback. *See* Ex. D.

Plaintiff's observation that different IP addresses appear across the four consent events is likewise unremarkable. IP addresses change frequently for residential internet users, and the fact

99224\329307913.v1

that Plaintiff's IP address differed across four sessions spanning sixteen months is entirely expected. The presence of an IPv6 address in one record and IPv4 addresses in others simply reflects the ongoing transition between internet protocols and has no probative value.

The plaintiff devotes an entire subsection to the fact that Everything Health produced no screen recording or visual playback for the September 10, 2024 consent event—the only one of the four events lacking a video exhibit—and argues that Defendant's evidentiary record is therefore facially incomplete.  Putting aside that this argument necessarily implies the other three consents are facially valid,  Plaintiff still provides no authority to suggest that video evidence is required to prove consent – no such authority exists.  The unavailability of a single video playback does not implicate the reliability of the consent, does not undermine the remaining three corroborated events, and does not undermine the evidentiary value of the consent itself.

### viii. The Motion to Strike Class Allegations Was Properly Filed and Should be Granted

Plaintiff argues that the motion to strike class allegations violates the Court's February 12, 2026 Order (Doc. 14) because that Order invited only a "dispositive motion."   This argument attempts to interpret the Court's Order without considering the circumstances in which the Order was entered. The Court's Order invited Defendant to file a dispositive motion rather than engage in a discovery dispute.  A motion to strike class allegations is a proper component of dispositive briefing because, if granted, it would dispose of the class claims in their entirety. The Eighth Circuit in *Donelson v. Ameriprise Financial Services, Inc.*, 999 F.3d 1080 (8th Cir. 2021), expressly approved the practice of striking class allegations prior to class certification where it is apparent from the pleadings that class certification would be impossible.

### ix. Even Arguable Defenses Require the Denial of Class Certification

99224\329307913.v1

Assuming this Court does not grant summary judgement, the substantive basis for striking class allegations remains compelling. If this Court holds that someone else other than the Plaintiff provided the Plaintiff's contact information, this set of circumstances presents an individualized inquiry that inherently thwarts class treatment of this case. Not only does it present a defense unique to the Plaintiff, it also injects an individualized inquiry rendering the Plaintiff's claims uncommon and atypical, as well as creating a series of mini-trials inappropriate for class treatment.

Plaintiff attempts to frame Everything Health's consent defense as a ploy to defeat class allegations. This framing is wholly inappropriate and inconsistent with established class action law. It is established that the existence of a defense to a purported class representative's claim renders the class representative inadequate and requires the denial of class certification. "The presence of an even arguable defense peculiar to the named plaintiff . . . may . . . bring into the question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the class will suffer." *CE Design Ltd. V. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

Everything Health's business includes obtaining leads through third-party lead-generation services that collect consumer consent through individualized web-form interactions. *See* Doc. 17, Ex. A. Determining whether any given class member consented requires examining the specific web form submitted, the disclosures presented, whether the individual affirmatively clicked to consent, and whether consent was subsequently revoked. This entire scenario illustrates the extensive individual factual inquiries required to determine a particular class member provided express consent, and such inquiries would unquestionably predominate over any common issues.

99224\329307913.v1

In *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537 (D. Minn. 2017), the court denied class certification because "the issue of consent is unique to each individual class member" and that "[l]iability in each instance, or the extent thereof, will hinge on whether the class member orally consented to be called when contacted by Universal; voluntarily provided his or her cell phone number, either directly or through the car purchaser; appeared at the time of the purchase and agreed to be contacted; or provided his or her consent in some other way." The court observed that "'[t]he permutations involving' several different ways consent may have been provided, for more than 1.4 million cell phone calls to thousands of persons across the country, 'are nearly endless,'" and therefore concluded that "consent is too individualized an inquiry, overwhelming any questions common to the class, to warrant certification." Likewise, in *Newhart v. Quicken Loans, Inc.*, the court denied class certification where individuals had provided consent through various means, noting that "'[a]t trial, Quicken . . . would be entitled to call the borrowers (and others) to prove its consent for any of the challenged calls and the borrowers could, in turn, attempt to refute records or recordings of consent.'" 2016 U.S. Dist. LEXIS 168721 (S.D. Fla. Oct. 13, 2016). Accordingly, the *Newhart* court found that "the class inquiry would fracture into mini-trials" to determine each individual's consent status. *Id*.

A case directly on point is *Blair v. CBE Group, Inc.* In *Blair*, the court held that the issue of consent requires extensive individual inquiries into whether each class member gave express consent. 309 F.R.D. 621, 631 (S.D. Cal. 2015). The plaintiffs in *Blair* disputed that any consent was given; the court stated in response that, "Plaintiffs' arguments, including the evidence sited in support of their position, illustrate the need for "mini-trials" into whether each class member [gave consent]." *Id. See also Connelly v. Hilton Grand Vacations Co.*, 294 F.R.D. 574, 577 (S.D. Cal. 2013) ("Although TCPA cases are not *per se* unsuitable for class resolution, class certification is

99224\329307913.v1

warranted only when the unique facts of a particular case indicated that individual adjudication of the pivotal element of prior express consent is unnecessary.") (internal citations omitted).

Here, Plaintiff has given his consent on four separate occasions, at different locations, with different consent forms. Each of these represents a valid consent on their own. Plaintiff's dispute of each requires an individualized analysis of each consent. This situation presents exactly the kind of individualized inquiry for which courts have consistently found class certification inappropriate. *See Balthazor v. Cent. Credit Servs., Inc.*, No. 10-62435, 2012 U.S. Dist. LEXIS 182275, at *16 (S.D. Fla. Dec., 27, 2012)(denying certification of TCPA case under commonality and predominance because "resolution of each putative class member's TCPA claim would…involve an individual assessment of whether each class member consented to receive telephone calls on their cellular telephone numbers."); *Hicks v. Client Servs., Inc.*, No. 07-61822, 2008 U.S. Dist. LEXIS 101129, at *20 (S.D. Fla. Dec. 11, 2008)(denying TCPA class action because "consent is an issue that would have to be determined on an individual basis . . .").

Plaintiff's citation to *Robertson v. Mortgage Research Center, LLC*, 2024 U.S. Dist. LEXIS 221676 (W.D. Mo. Dec. 9, 2024), does not save his position. Robertson held that the motion to strike was "premature" because the parties had not yet developed a factual record. Here, in contrast, there is already a substantial factual record. Defendant has produced four documented consent events for the named plaintiff alone, demonstrating that consent-related inquiries will be inherently individualized across the putative class.

Moreover, Plaintiff himself is an inadequate and atypical class representative presenting uncommon issues and answers. While immaterial factual differences between a named plaintiff and individual class members may not defeat class, typicality is destroyed when there are defenses unique to the named plaintiff. *In re Schering Plough Corp.*, 589 F.3d 585, 598-99 (3d Cir. 2009);

13

99224\329307913.v1

*McFarland v. Yegen*, No. 88-4797, 1989 U.S. Dist. LEXIS 16965, \*12, 17 n. 10 (D.N.J. 1989) ("The existence of unique dispositive defenses applicable only to the putative class members or the plaintiff, but not both, is indicative of a significant disparity in their respective legal positions, thus precluding the plaintiff from meeting the typicality requirement . . . typicality is destroyed because the existence of the unique defense causes the factual and/or legal stance of the named plaintiff to be 'markedly different' from that of the putative class members . . .").

The existence of four separate consent forms bearing his personal information makes him fundamentally unlike putative class members who allegedly received calls without any consent whatsoever. His unique circumstances require the very kind of individualized inquiry that defeats typicality and adequacy under Rule 23(a)(3) and (4).

### *x. Plaintiff's Class Definition Constitutes An Impermissible Fail-Safe Class*

Additionally, Plaintiff argues that the proposed class definitions are not fail-safe. Individuals who would comprise a proposed class must be "readily identifiable." *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972). Courts reject so-called "fail-safe classes" on the ground that their members cannot be ascertained. *Progressive Health and Rehab Corp. v. Quinn Med., Inc.*, 323 F.R.D. 242, 245 (S.D. Ohio 2017). A fail-safe class is one defined in such a way that "a court [must] rule on the merits of the claim . . . in order to tell who was included in the class." *Melton ex rel. Dutton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 288 (D.S.C. 2012). Such classes are impermissible because each putative class member either prevails on the merits or, by losing, falls outside the class definition entirely and thus escapes being bound by an adverse judgment. *Id.* (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 826 (7th Cir. 2012)). Stated differently, a class whose membership can only be ascertained after the Court

99224\329307913.v1

resolves whether each potential member possesses a valid claim constitutes an improper fail-safe class. *Id*. at 289.

Under the TCPA, it is unlawful to place calls to any number "without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(5) & (b)(1)(A)(iii). Where plaintiffs define a class by reference to the absence of its members' consent to receive the calls at issue, the court cannot ascertain class membership without first adjudicating the merits of each individual's TCPA claim—namely, whether that individual in fact withheld consent. A class so defined is properly characterized as an impermissible fail-safe class.

Plaintiff's proposed class definition includes individuals whose telephone numbers are listed on the National Do Not Call registry. The regulations implementing the TCPA prohibit telephone solicitation calls to any number listed on the National Do Not Call Registry. Therefore, the proposed Do Not Call Registry Class would only include individuals who will automatically prevail on the TCPA claim. Individuals who consented would be defined out of the class. This is a textbook fail-safe class and is impermissible.

## CONCLUSION

The undisputed material facts establish Defendant's entitlement to summary judgment. Plaintiff provided prior express written consent to receive telemarketing calls on four separate occasions across sixteen months, each time voluntarily submitting his personal information through web forms containing clear consent disclosures authorizing contact by marketing partners. These consent events are documented and corroborated by multiple independent verification systems, including Verisk Visual Playback session recordings and ActiveProspect TrustedForm certificates. No genuine dispute of material fact exists: Defendant possessed valid prior express written consent before placing the calls at issue, and Plaintiff has offered no evidence beyond his

15

own uncorroborated declaration to suggest otherwise. Defendant is therefore entitled to judgment as a matter of law on all of Plaintiff's individual claims.

In the alternative, should the Court conclude that Plaintiff's individual claims withstand summary judgment, Plaintiff's class allegations should nonetheless be stricken. Individualized inquiries into each putative class member's consent will necessarily predominate over any questions common to the class, making class-wide adjudication inappropriate. To identify prospective class members who share typicality and commonality with Mr. Blubaugh, the Court would need to conduct a member-by-member analysis, effectively requiring resolution of the merits of each individual's claim in order to determine whether that person falls within the proposed class definition. As set forth above, such a requirement is the hallmark of an impermissible fail-safe class, and therefore the allegations should be stricken.

WHEREFORE, Defendant respectfully requests that this Court grant summary judgment in Defendant's favor on all of Plaintiff's individual claims, or, in the alternative, strike Plaintiff's class allegations, and grant such further relief as this Court deems just and proper.

Respectfully submitted,

**HINSHAW & CULBERTSON, LLP**

By: */s/ James M. Brodzik*
James M. Brodzik, #66700
Joshua C. Hinkle, #72845
701 Market Street, Suite 260
St. Louis, MO 63101
P: 314-241-2600
F: 314-241-7428
jbrodzik@hinshawlaw.com
jhinkle@hinshawlaw.com

Attorneys for Defendant
EVERYTHING HEALTH INVESTMENTS,

16

99224\329307913.v1

LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically filed and served electronically via the Court's ECF system on all parties receiving ECF notices, on this 28th day of April, 2026.

_/s /James M. Brodzik_

99224\329307913.v1